The argument this morning is 20-1077, International Technologies v. Samsung. Mr. Haynes, whenever you're ready. Thank you, Your Honor. Mr. John Haynes and I represent the appellate, International Technologies, who I will refer to as ID Tech, in my argument. The entire purpose of the method recited in Claim 1 of the 652 patent was to allow for newer technologies, such as cell phones, to communicate with the 21 million conventional card readers that had already been deployed at merchants throughout the country. The district court's construction of the phrase exhibiting a different sensitivity to electromagnetic fields, or sorry, to magnetic fields, defeats that purpose by importing structural limitations that prevent the method from being used with the very conventional card readers with which it was designed to work. Neither the claims nor the specification place structural limitations on the reader heads in those conventional card readers. Claim 1 merely acknowledges that the reader heads in conventional card readers exhibit a different sensitivity to external magnetic fields. And what was your, excuse me, this is Sharon Price, what was your proposed claim construction, Mr. Haynes? Our proposed construction was that the reader heads exhibit a different sensitivity to the same magnetic field. And what we were referring to there was the external magnetic fields that are being generated as part of the claim method. And perhaps we should have been more explicit about that, but the patent itself is actually very explicit about that. Every time it refers to the magnetic fields that are at issue and that the reader heads of the conventional card readers must respond to, it refers to those magnetic fields as the external magnetic fields. And we see that, for example, at column 5, line 59. It states, the heads of the conventional magnetic stripe card readers exhibit a different sensitivity to an external magnetic field. And that tells us two things. First, it tells us that conventional card readers inherently exhibit a different sensitivity when they're exposed to those fields. And second, it tells us that the sensitivity at issue is how the reader heads respond to external magnetic fields. That's what the claim method is about. It is about providing the ability to generate magnetic fields external to a conventional card reader, such that the conventional card reader can receive and interpret those magnetic fields. And that's all that's required. The district court's construction requires that those reader heads exhibit a different output intensity in response to the same change in applied magnetic flux. That construction provides no clarity at all. It substitutes output intensity for sensitivity and then defines magnetic fields to be the same change in magnetic flux. That construction is wrong for at least three reasons. The first is that it introduces the notion that the sensitivity that the claim is referring to must be in response to the same change in applied magnetic flux. Neither the claims nor the specification refer to the external magnetic fields as creating the same change in applied magnetic flux. To the contrary, in the claimed invention, the magnetic fields at issue are those that are transmitted externally from the card reader. And those external fields, when they're received by the separate reader heads contained in those conventional card readers, will not cause the same change in magnetic flux on those reader heads as a matter of physics. Instead, each reader head will receive the externally generated fields at different strengths and exhibit a different output sensitivity regardless of the structure of the individual reader heads if considered in isolation. This is Judge Toronto. Can I ask this question? And forgive me if I get some of the language wrong. But I took it that you agreed, if not expressly, then implicitly, in your gray brief, maybe in the blue tube, in your gray brief around page 9, that if you look at figure 3B of the patent, that that is, in idealized form, showing the adapter or the outside source as conveying to the two read heads at equally distant from the production of the magnetic field. And therefore, one assumes in that scenario that the two heads are, in fact, getting the identical strength magnetic field. And finally, therefore, 3B requires an internal inherent structural inductance difference between the two heads. Do I understand your understanding of 3B to be what I just said? Not exactly. In figure 3B, and what we refer to on page 9 of our brief, the gray brief, is Samsung's view that that magnetic field would be received by those reader heads. Right, but then you respond not by denying it, but by saying, well, that's just one of the two ways reader heads can exhibit different sensitivities. And now look at 4B, where the magnetic field gets to 10A and 10B at different times, and therefore 10A and 10B each experience a different strength of the magnetic field, and they will then exhibit a different sensitivity because they're actually getting a different strength of the magnetic field, and that's an alternative way that must be covered by the language. But as to 3B, I did not see you doing anything but accepting that the read heads in 3B had to have inherent structural inductance differences. You're correct, Your Honor, that we didn't explicitly take that point on, and the reason for that is that it requires a deeper discussion of the physics that are involved. The fact of the matter is that the magnetic fields that are generated are not going to be received with exactly the same strength, even in figure 3B, but it's pretty close in 3B. We do concede that. I mean, the positioning of the inductor in that claim is going to generate magnetic fields that are very close in strength, and therefore the difference in sensitivity will be minor. And you're correct that figure 4B is a much clearer example of the field strength that will undoubtedly and unquestionably be received with a different strength. Right. I guess the single thing that seemed to me to weigh most in favor of the other side's point of view on this is that 3B seems for all the world to be about inherently different structural features of the heads, independent of the locational difference with respect to the source of the magnetic field. And then when the patent immediately goes on to say, there's another way you can align this, look at 4B, it merely shows an alternative location but says not one word about suddenly that now producing the required exhibited difference in a completely different way, even if the two read heads have identical inherent structures. And the absence of any description of the difference between 3B and 4B in terms of anything other than, look, you can put this in a different place, seemed to me to be rather strong confirmation for the idea that everything about the description of the read heads in terms of differences is about inherent differences. Your Honor, I respectfully disagree with part of that, which is in Figure 4B, the statement is, apart from the difference in spatial orientation of the inductor relative to the two reader heads. That is noting that there is a difference in operation and that difference in operation is due to the fact that the inductor is located at a different position in Figure 4B. But I think it's also important to understand that the claim doesn't require the position in either 3B or 4B. It says that you can put that adapter anywhere proximate to the card reader, anywhere around it. And the notion that conventional card readers exhibit a different sensitivity to external magnetic fields is something that's assumed in the specification. That's not a point of novelty or something that's special or different about conventional card readers or that was novel about this invention. What was novel about this invention was that it worked with conventional card readers by generating external magnetic fields. What did you just say about what the patent kind of assumes about the character of the conventional card readers? The patent describes the characteristic of conventional card readers having a difference in sensitivity as an assumed property of conventional card readers. It says that conventional card readers exhibit a different sensitivity. It doesn't say that that sensitivity must be due to a difference in the structure of the reader head. It says they exhibit a different sensitivity to externally generated magnetic fields. And that's important because the district court's construction ignores the fact that the fields we're talking about in the claim are externally generated magnetic fields and that the difference in sensitivity is a response to those externally generated magnetic fields. And there is a difference in sensitivity because in the claim you can generate those external magnetic fields anywhere in proximity to the card reader. And the only limitation that is directed to the field strength in that claim relates to the externally generated magnetic fields. And those are required only to be of sufficient strength to be received by their respective reader heads. And so while claim three and frankly claim four, it could be the case that in a conventional card reader you might have a different structure for the inductors. You might. And if you did, that would give you a difference in sensitivity. But you also may have exactly the same reader heads. And if you have exactly the same reader heads, conventional card readers will still generate a difference in sensitivity with respect to externally generated electromagnetic fields. Mr. Haynes, this is Judge Lynn. It seems to me you're saying that both of the reader heads in a conventional reader would exhibit different sensitivities based on the different fields that are applied. Is that correct? No, Your Honor, what I'm saying is... If you're saying that reader heads are all... all exhibit different sensitivities depending on where the external coil is located. Your Honor, the difference in sensitivity is between the two reader heads that are located in the conventional card readers. So with respect to each other, they will exhibit a different sensitivity to an electromagnetic field that is generated external to the card reader. If you move that electromagnetic field somewhere else... You're referring to what is illustrated in 4B, correct? It's illustrated in 4B, but again, the claim requires that you can place that adapter anywhere you want approximate to the card reader. Yeah, but in order to achieve that result, then the reader heads themselves have to have a different sensitivity, such as in 3B. No, given the spatial positioning of the reader heads within the card reader, you will have a difference in sensitivity with any conventional card reader. And the patent explains... gives specific examples of conventional card readers that work with the invention. And there's no real dispute that those conventional card readers... that there are at least some conventional card readers that have the same structural inductance. And the district court's construction would say that the hypercom terminal that is specifically identified in the specification as working with the invention does not work with the invention. And that cannot be a correct result. And it's important to recognize that we're importing a limitation into the structure of the conventional card reader, which was not the point of the invention. The point of the invention was to work with all the 21 million conventional card readers that were already out there. And I'm not sure if I heard the beep, but I think I may have heard the beep. I couldn't tell either. I think you did. All right. All right. Well, we'll retain some of your rebuttal time. Let's hear from Mr. Cordell. Thank you. Thank you, Your Honor. May it please the court, Ruffin Cordell for Samsung. I'd like to begin with the claim language, if I might, because the claim language, to me, really tells the tale here. The claim begins with a recitation of not just a reader head, but a magnetic stripe reader device. So we have both a system and a component within it. And all of the action, if you will, in this appeal is about the reader head, but at each stage of the proceeding, when ID Tech tries to take us back to a higher level, introduce things like distance and orientation into the equation, they really seem to be talking about the magnetic stripe reader device rather than the reader head itself. But the claim is very specific. It tells us that this reader head has a specific characteristic, that the reader head exhibits different sensitivity to magnetic fields. It doesn't say that it's at a particular distance from a source. It doesn't say that it's oriented in a particular relationship. It says that it exhibits, it has a characteristic of having a different sensitivity to magnetic fields, plural. Mr. Cordell, this is Judge Sorrento. Let me just describe at least one thought that I've been contemplating. One way to look at this is that the claim language doesn't actually resolve this question. As long as you keep the word exhibiting in front of the rest, exhibiting different sensitivity to a magnetic field could mean what two things do when in a specific location. So that, for example, two students in a classroom, one near the window, one near the inside wall, might exhibit different sensitivity to outside noise, even if they have the identical hearing characteristics. So it seems to me that the language of the claim all by itself could be read in the way that I think ID Tech is reading it, but might also refer to something inherent in, to use my analogy, the hearing ability of the two students in the classroom, and that it's therefore necessary to go look at what the specification is doing to illuminate whether it is talking about an inherent characteristic, or rather something that is shown when things are in a particular location. What am I missing in the claim language itself about why you think that claim language points distinctively toward the inherent characteristic meaning? So first, I absolutely agree with you that when you get to the specification, it lays to rest any question that you have. Well, subject to the big issue that, it seems to me, you need to address, which is the whole point here is to make 21 million conventional magnetic stripe readers work. And I will get right to that, but I'd like to pause with the claim language if I can, because ID Tech has put great significance into the term exhibiting, but what it really is is you need a verb there to associate a characteristic with the reader head. And it's odd that we've overlooked the term sensitivity. Both experts agreed that sensitivity is in fact a characteristic of an inductor embedded in a structure we call a reader head. And that's not in dispute. They both agree that that's true. And to take your honor's example with respect to hearing, we don't talk about the sensitivity of one's hearing based on the proximity to the speaker. It's a comparative, it's a figure of merit. It's something that tells me something about my ability to receive and decode signals. And if you're going to allow an additional degree of freedom into that analysis based on the distance to the source, essentially the power of the signal, that's not sensitivity. That just relates to your position, the power of the signal that you get. So the only way that sensitivity really makes any sense in the way the experts discuss it is if everything is equal and fair. If two devices are compared to the same change of magnetic flux the way the court described it, and they produce different outputs, then that means they have different sensitivity. It doesn't simply mean that they receive different signals, which is what ID Tech advocates. And if I can then go to your question about the 20 million-some-odd point-of-sale terminals. We've gotten into a great debate about what a conventional point-of-sale terminal is, but the patent doesn't really allow us to have that debate. So if we begin at the bottom of column five, at line 63 or so, it says, that the following discussion of the operation of the adapter according to embodiments of the present invention relies upon information taken from ISO standard 7811. These are standardized devices. This isn't a question where we need to go in and do lots of research. The patent tells us how they are configured. Just above that, it tells us the heads, this is about line 59, the heads of the conventional magnetic stripe card reader exhibit a different sensitivity to an external magnetic field. It doesn't say that they're positioned differently. It doesn't say that they're treated in different ways. It says the heads exhibit exactly the claim language, different sensitivity to an external magnetic field. Can I ask you this? This may not be quite a precisely formulated question, but does the record contain ISO standard 7811 and whether or not it contains it, does it say that the reader heads have inherently different, I guess, inductance properties? It does not, Your Honor. It is neither part of the record, at least not explicitly. We didn't put it into the appendix. It is referenced in the patent, however. The 7811 standard actually relates to the tracks on the credit card and gives us precise information about the bit density and the position of those tracks. Mr. Haynes went on and on about external magnetic fields. The external magnetic fields in a conventional card reader are generated when you swipe the card through the card reader and the movement of the magnetic domains on the stripe set forth in 7811 generate the magnetic fields. But if I can stay with that for a moment, remember we're talking about a conventional card reader and that conventional card reader is actually the one shown in Figure 1 of the patent. In Figure 1 of the patent, it tells us that all of this discussion about distances and changing the sensitivity of a conventional reader head based on moving a source around is simply nowhere to be found. Instead, what you find is that the reader heads in a conventional point-of-sale terminal are fixed right next to the tracks that exist on the credit card. In my family, in the days when we only had mag stripes, we would wear out a credit card because the magnetic stripe abuts against the reader head as it moves through there. There are no variable distances. The distances are very small and they're made to be so intentionally to maximize the signal received by the reader heads. Figure 1 is not exactly precise about showing, let's just call it, the alignment of the tracks with the reader heads. Is there something in the specs description of Figure 1 say the two tracks align with the two reader heads in the precise sense that the distance from Track 1 to Head 1 is the same as the distance from Track 2 to Head 2? I had searched for the same thing, Your Honor, looking for a micron explanation, and it's not quite there. In the discussion of Column 6, there is an extensive discussion about the typical configuration of conventional reader heads, and that typical configuration lines up Track 1 with the Track 1 reader head and Track 2 with the Track 2 reader head, but it doesn't give you the separation dimension per se. We do have a reference in the appendix, at Appendix 6194, which is the deposition of Mr. Wallner, where he describes the fact that these reader heads are intended to abut the tracks and be very, very close. Is it 10 microns? Is it 50 microns? I can't tell you, but it is intended to be very, very close. And if I can stay with the Column 6 discussion, we've also had much of the briefing where ID Tech attempts to set aside the only example that the patentee gives us of what different sensitivity really means in terms of a numeric quantification, and they say this 20 dB example is just an example, but that's not what it says. What it tells us in Column 6 at about line 19, starting at 18, it tells us that accordingly the Track 1 reader head 10B is typically configured to detect an external magnetic field approximately 20 dB more sensitive than the Track 2 reader head. This isn't just an example. This is the typical configuration of a standardized point-of-sale terminal, and that's the evidence we have directly from the intrinsic record, directly out of the specification. And so just to, I think, complete the thought that at least I'm understanding, is that when, therefore, you get to the later paragraph that enumerates a host of, you know, in-service conventional card reader devices, there is not at that place anything that describes the inherent properties of the reader heads, and in the absence of that, one has to look to the Column 6 to assume that they're actually different. That's right, Your Honor, and that's what the patentee told us. Now, I think what ID Tech has done is they went out and found a variant of one of the terminals, and they put in some extrinsic evidence sort of after the initial claim construction ruling but before the district court had affirmed the special master's report, where they suggested that the one they tested showed very similar reader heads. Right, and I thought that that declaration also says, beyond testing or describing the particular one, also says that since the 1990s, these devices were sold with structurally identical reader heads. So they had two different declarations. They had one from their expert where he tested this one variant of... It wasn't a T7. It was a T7P or T7PF. They never really explained what the difference was, and then they had a declaration from one of their executives who said he was in the business and that he believed that these were... the reader heads were somewhat similar, but all of that extrinsic evidence, you know, even if we overlook the timing of it and the fact that it was put in after the fact, all of that extrinsic evidence can't contradict what is set forth here in black and white in the intrinsic record. They tell us that these conventional point-of-sale terminals have reader heads with radically different sensitivities manifest into a 20 dB difference between the two. That's a hundred times difference in terms of its sensitivity. And there's really nothing to contradict that in the record. There's not a shred of evidence anywhere that suggests that those reader heads had different sensitivities based on the distance to the field source because, as I pointed out, the field source was a credit card moving through the slot at micron distances from the reader heads themselves. Anything further, colleagues? Not to me. No, thank you. Thank you, Your Honor. Thank you. Mr. Haynes, you've got some time, a few minutes left for rebuttal. Thank you, Your Honor. Let me start by picking up where Mr. Ruffin left off. The specification says absolutely nothing to require that the reader heads of conventional card readers must have a different structure. But what it does say over and over and over again is that this invention works with conventional card readers available at the time. It says it in the first sentence of the abstract, the first sentence of the summary of the invention,  It's the whole point of the invention. The limitation that's being imported into the claims makes that impossible. No one is disputing, and Mr. Ruffin won't tell you, that the district court's construction will allow the invention to work with the 21 million conventional card readers that had been deployed at the time. And Your Honor's already pointed out that at Appendix 5802, there is unrebutted testimony from somebody that has been working in the industry his entire career that as of the 1990s, most of the conventional card readers did not have a difference in structural inductance. So there may have been some, and the part of the invention that is not claimed that requires selective communication where you actually transmit magnetic fields of having different strengths, which is referenced in Claim 7 but not Claim 1, may take advantage of some subset. But the broadest Claim 1, and the invention itself, was designed to work with all card readers. Can you just specifically address the Column 6 use of the word typically? It does say typically in Column 6 in the context of the specific embodiment of selective communication. That sentence is also odd because when it talks about what is typical, it's referencing, it says it's typically configured to detect external magnetic field approximately 20 dB more sensitive. So the external magnetic field that it's talking about are the magnetic fields that are outside the card reader. Now, Mr. Ruffin indicated that the external magnetic field is the magnetic field generated by the card swipe, but that's not what it's talking about. The external magnetic fields that are being talked about in this invention are specifically designed to be outside of the card swipe. The title of the invention is External Adapter. And if you read the specification, there are numerous examples, references to the fact that what they wanted to avoid was getting in the way of the conventional card reader being used with a credit card. So instead, you're going to transmit fields outside of that slot. And those are the external fields that it's talking about. Okay, I think we heard the buzzer go off. We thank both sides and the case is submitted. Thank you. Thank you. That concludes our proceeding for this morning. The Honorable Court is adjourned until tomorrow morning at 10 a.m.